## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRENDA LEE KRAMER,       :
      Plaintiff,       :
                       :      NO. 3:12-cv-1622
      v.            :
                       :      (JUDGE NEALON)
CAROLYN W. COLVIN,[1]      :
Acting Commissioner of Social Security,  :
      Defendant       :

FILED
SCRANTON

FEB 1 0 2014

PER _____
DEPUTY CLERK

### MEMORANDUM

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the claim of Plaintiff, Brenda Lee Kramer, for social security disability insurance benefits.  For the reasons set forth below, the decision of the Commissioner will be affirmed.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."

The administrative law judge ("ALJ") determined that Kramer met the insured status requirements of the Social Security Act through December 31, 2014.  (Tr. 15, 17, 126).[2]  In order to establish entitlement to disability insurance benefits, Kramer was required to establish that she

---

1. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is substituted for Michael J. Astrue as the Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

2. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on October 15, 2012.  (Doc. 7).

suffered from a disability on or before that date. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B); 20 C.F.R.

§404.131(a); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Kramer was born in the United States on May 16, 1957. (Tr. 31, 122). She completed

the tenth grade, can read, write, and understand the English language, and has basic math skills.

(Tr. 37-38, 165). Kramer was a sewing machine operator from 1981 until 1994 and worked as a

laborer from 1995 until 2005. (Tr. 166). She worked with many different employers in 2006 and

2007, and became a custodian in a high school in November 2007, where she worked through

May 2008. (Tr. 54, 60, 166). Kramer was employed as a "picker" at Ollie's Distribution

Warehouse from June 2008 until May 2009, where she "picked products to be picked to be

loaded on trucks to be shipped." (Tr. 34, 54, 155-157, 166). She worked as a school van driver

for D.B. Fisher's from August 2009 through December 2009. (Tr. 31-34, 54, 155, 166).

On December 14, 2009, Kramer filed an application for a period of disability and

disability insurance benefits alleging disability beginning December 14, 2009, due to mental

impairments. (Tr. 67). The claim was denied initially on February 23, 2010. (Tr. 68-71). On

March 6, 2010, Kramer requested a hearing before an ALJ. (Tr. 73). An ALJ hearing was held

on February 4, 2011. (Tr. 23-65). On February 24, 2011, the ALJ issued a decision denying

Kramer's application. (Tr. 15-22). On March 9, 2011, Kramer requested that the Appeals

Council review the ALJ's decision. (Tr. 10). The Appeals Council thereafter concluded that

there was no reason to review the ALJ's decision, which means that it stood as the final decision

of the Commissioner. (Tr. 1-3).

Kramer filed a complaint in this Court on August 17, 2012. (Doc. 1). Supporting and

opposing briefs were submitted and the appeal is now ripe for disposition. (Docs. 8-9). For the

reasons set forth below, the decision of the Commissioner denying Kramer's application for

social security disability insurance benefits will be affirmed.


**<u>Standard of Review</u>**

When considering a social security appeal, the court has plenary review of all legal issues

decided by the Commissioner.  <u>See</u> <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91

(3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir.

1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of

the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  <u>Id.</u>; <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d

Cir. 1993); <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988).  Factual findings which are

supported by substantial evidence must be upheld.  42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>,

247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial

evidence, we are bound by those findings, even if we would have decided the factual inquiry

differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by substantial

evidence."); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Keefe v. Shalala</u>, 71 F.3d 1060,

1062 (2d Cir. 1995); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but

'rather such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988) (quoting <u>Consolidated Edison Co.</u>

<u>v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d

198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial

evidence has been described as more than a mere scintilla of evidence but less than a

preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record, substantial

evidence may be "something less than the weight of the evidence, and the possibility of drawing

two inconsistent conclusions from the evidence does not prevent an administrative agency's

finding from being supported by substantial evidence." Consolo v. Federal Maritime

Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record,"

Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from

its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of

evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails

to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting

certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07.  Therefore, a court

reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v.

Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir.

1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Further,

4

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92 ("The claimant bears the ultimate burden of establishing steps one through four."), citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or

5

other similar schedule.  The residual functional capacity assessment must include a discussion of

the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1

("'Residual functional capacity' is defined as that which an individual is still able to do despite

the limitations caused by his or her impairment(s).").

**Discussion**

      Initially, the ALJ concluded that Kramer met the insured status requirements of the Social

Security Act through December 31, 2014.  (Tr. 17).  The ALJ then proceeded through each step

of the sequential evaluation process and determined that Kramer was not disabled.  (Tr. 16-22).

      At step one, the ALJ found that Kramer had not engaged in substantial gainful work

activity since December 14, 2009, the application date.  (Tr. 17).

      At step two, the ALJ determined that Kramer suffered from the severe[3] impairments of

chronic paranoid schizophrenia and anxiety disorder.[4]  (Tr. 17).

      At step three of the sequential evaluation process, the ALJ found that Kramer did not

have an impairment or combination of impairments that met or medically equaled a listed

impairment.  (Tr. 18-19).

---

3. An impairment is "severe" if it significantly limits an individual's ability to perform basic
work activities.  20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes
necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing,
speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe"
when medical and other evidence establish only a slight abnormality or a combination of slight
abnormalities that would have no more than a minimal effect on an individual's ability to work.
20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

4. The ALJ determined that Kramer also had gastroesophageal reflux disease, a nonsevere
impairment.  (Tr. 17).  Additionally, Kramer had a history of alcohol abuse, which no longer
required treatment and caused no more than minimal limitations of function; therefore, the ALJ
found that it too was a nonsevere impairment.  (Tr. 17).

At step four, the ALJ determined that Kramer had the residual functional capacity to perform a full range of work at all exertional levels, limited to performing jobs that involve no production or pace work, jobs with only occasional changes, and jobs where Kramer works in contact with or in view of ten people or less. (Tr. 19).

Next, the ALJ determined that Kramer would be capable of performing past relevant work as a janitor and material handler ("picker") because this work does not require the performance of work-related activities precluded by her residual functional capacity. (Tr. 22). Kramer was therefore found to be not disabled under the Act since December 14, 2009, the date the application was filed, through the date of the decision, February 24, 2011. (Tr. 15, 22).

In her appeal brief, Kramer argues that the ALJ erred in finding that she does not have an impairment medically equaled to one listed in Appendix 1, section 12.03 or section 12.06. (Doc. 8, pp. 4, 7) (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.03, 12.06). Kramer states that it is uncontested that her mental impairments of chronic paranoid schizophrenia and anxiety disorder meet the A criteria. (Id.).[5] Next, Kramer asserts, contrary to the ALJ's determination, that her impairments have resulted in marked restriction of activities of daily living and in marked difficulties in maintaining concentration, persistence, or pace, satisfying the B criteria of both Listings. (Doc. 8, pp. 4, 8-9). She contends that the ALJ incorrectly discounted her low GAF scores. (Id. at p. 6). Kramer argues that the ALJ also erred in finding that she has the residual functional capacity to be introduced back into the work force. (Id. at pp. 2-3). Kramer alleges that she also meets the C criteria of both Listings, noting that she has a history of paranoia

---

5. Contrary to this claim, Defendant asserts that Kramer cannot satisfy the A criteria for Listing 12.03. See (Doc. 9, p. 13). However, because the B criteria is not also met, as will be discussed herein, this Court sees no need to evaluate the requirements in 12.03(A).

and is unable to function outside the home. (Id. at pp. 6-7, 9-10).[6]  She claims that the ALJ's

decision is not supported by substantial evidence and should be reversed. (Id. at p. 10).

A claimant meets section 12.03 when the requirements in both A and B, or the

requirements in C, are satisfied.  Listing 12.03 provides as follows:

> 12.03 Schizophrenic, Paranoid and Other Psychotic Disorders: Characterized by
> the onset of psychotic features with deterioration from a previous level of
> functioning.
>   The required level of severity for these disorders is met when the requirements in
> both A and B are satisfied, or when the requirements in C are satisfied.
>   A. Medically documented persistence, either continuous or intermittent, of one
> or more of the following:
>   1. Delusions or hallucinations; or
>   2. Catatonic or other grossly disorganized behavior; or
>   3. Incoherence, loosening of associations, illogical thinking, or poverty of
> content of speech if associated with one of the following:
>   a. Blunt affect; or
>   b. Flat affect; or
>   c. Inappropriate affect;
> or
>   4. Emotional withdrawal and/or isolation;
> AND
>   B. Resulting in at least two of the following:
>   1. Marked restriction of activities of daily living; or
>   2. Marked difficulties in maintaining social functioning; or
>   3. Marked difficulties in maintaining concentration, persistence, or pace; or
>   4. Repeated episodes of decompensation, each of extended duration[7];
> OR
>   C. Medically documented history of a chronic schizophrenic, paranoid, or other
> psychotic disorder of at least 2 years' duration that has caused more than a
> minimal limitation of ability to do basic work activities, with symptoms or signs
> currently attenuated by medication or psychosocial support, and one of the
> following:

---

6.  In her brief, Kramer interchanges her arguments in support of the "C" criteria for sections
12.03 and 12.06.  See (Doc. 8, pp. 6-7, 9-10).  As the B criteria for both Listings is the same, this
Court has combined the issues and will address all the arguments together.

7.  This term "means three episodes within 1 year, or an average of once every 4 months, each
lasting for at least 2 weeks."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(4).

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03.

A claimant meets Listing 12.06 when the requirements in both A and B, or in both A and

C, are satisfied.  Listing 12.06 provides:

A. Medically documented findings of at least one of the following:
1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
a. Motor tension; or
b. Autonomic hyperactivity; or
c. Apprehensive expectation; or
d. Vigilance and scanning;
or
2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
4. Recurrent obsessions or compulsions which are a source of marked distress; or
5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;
AND
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.
OR
C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.06.

In evaluating the B criteria for Listings 12.03 and 12.06, the ALJ determined that Kramer has mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties with concentration, persistence or pace, and no episodes of decompensation of an extended duration. (Tr. 18, 20). Accordingly, the ALJ found that the B criteria were not satisfied. (Tr. 18).

Regarding activities of daily living, the ALJ determined that Kramer has no problems with personal care. (Tr. 18, 20, 139-154). She manages her own personal hygiene, cleans the house, cooks her own meals, does the laundry, pays bills, drives, and is able to use public transportation. (Tr. 20, 37, 46, 139-143). The ALJ noted that Kramer initially reported walking approximately 1¼ miles a day and shopping in stores, but stated at the ALJ hearing that she no longer engaged in such activities. (Tr. 21, 46-47). Kramer testified that she was shopping at the Salvation Army the day before the ALJ hearing, but had an anxiety attack and therefore no longer wanted to go out shopping anymore. (Tr. 40, 46-47). When evaluating her social functioning, the ALJ found that Kramer has anxiety attacks when around groups of approximately ten to twelve people or more, but is generally okay when she knows the people. (Tr. 20, 45). She reportedly plays games with her niece almost nightly and " has no problems getting along with family, friends or neighbors." (Tr. 18, 20). Kramer testified that she gets her grandchildren off to school in the morning, then picks the youngest one up at 11:30 AM and babysits until 3:00 or 4:00 PM. (Tr. 20, 46). As to concentration, persistence or pace, Kramer alleged that she cannot pay attention for very long and has limitations in her memory and concentration. (Tr. 20, 40-41). However, the ALJ reasoned that Kramer watches television, crochets, plays games, and cooks, all

without difficulty.  (Tr. 18, 20, 46, 52-53, 143).

After review of the record, this Court rejects Kramer's argument that the ALJ ignored or misused her testimony regarding her activities of daily living.  See (Doc. 8, p. 5).  Additionally, the ALJ's decision to limit Kramer to performing jobs that involve no production or pace work, see (Tr. 19), does not equate with a finding of marked limitations with maintaining concentration, persistence or pace, see (Doc. 8, pp. 5-6).  See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(3) ("Marked" is defined "by the nature and overall degree of interference with function.").  Rather, the ALJ's restriction is designed to accommodate Kramer's moderate limitations in this area.  See Jenkins v. Astrue, 2012 U.S. Dist. LEXIS 128272, *34-35 (W.D. Pa. 2012) (concluding that the ALJ's decision to limit the claimant "to unskilled work, not involving a fast production pace, workplace hazards, or more than minimal interaction with other people" was "more than sufficient to accommodate [the] findings of moderate limitation").  Kramer's testimony that she only worked one day at B.C. Chicken before being told not to return and experienced an anxiety attack while at a bingo hall more than a year before the ALJ hearing, see (Doc. 8, pp. 5, 9), is also insufficient to show marked limitations in light of all the evidence of record establishing her ability to function.  Accordingly, there is substantial evidence to support the ALJ's finding that Kramer does not have marked restriction of activities of daily living, nor marked difficulties in maintaining concentration, persistence, or pace, nor does she satisfy the remaining B criteria.

The ALJ further determined that there is no medical basis in the record for any significant restriction of activities of daily living.  (Tr. 21-22).  The ALJ concluded that although Kramer's medical impairments could cause her alleged symptoms, her statements concerning the intensity,

11

persistence, and limiting effects are not credible to the extent they are inconsistent with the residual functional capacity assessment. (Id.).

There is no basis to question that credibility judgment. The ALJ was not required to accept Kramer's claims regarding her limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983) (providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the ALJ observed and heard Kramer testify, the ALJ is the one best suited to assess her credibility and this Court will not disturb those determinations.

The ALJ found that Kramer's allegations are also undermined by the clinical findings and the limited degree of treatment, explaining that recent treatment was essentially limited to medication. (Tr. 21). The ALJ considered Kramer's testimony that she has problems lifting, bending, and standing because she gets dizzy when she gets up too quickly, a side effect of her medication. (Tr. 20, 50-51). Medication keeps her "at a medium", controlling the paranoia and the voices, but does not prevent the anxiety attacks. (Tr. 20, 39, 49-50). The ALJ determined that despite the side effects Kramer testified about, she did not complain of any significant side effects of her medication on an ongoing basis or effects that did not resolve with a change in

medication. (Tr. 21). Kramer sees a doctor once a month about her medications, but receives no

other treatment or counseling. (Tr. 21, p. 39).

    The ALJ considered Kramer's inpatient hospitalization from December 19, 2009 through

December 30, 2009, and noted that no subsequent hospitalizations were required. (Tr. 21, 32,

170). The ALJ reviewed the clinical findings at the time of Kramer's admission to Philhaven,

which indicate that she denied suicidal or homicidal ideation, or hallucinations. (Tr. 21, 181-

182) (The records state that Kramer's husband had her committed because she had been off her

medication and was having paranoid thoughts that her stepson was poisoning her.). Upon mental

status exam, she was cooperative, had good eye contact, clear speech, and was alert and oriented

in three spheres. (Id.). When Kramer was discharged, she described her mood as "happy." (Tr.

21, 183). The ALJ noted that on April 27, 2010, Kramer was having no strange thoughts or

hallucinations, and on August 16, 2010, she reported that things were going well and she was

having no major problems, no hallucinations. (Tr. 21, 249-251) (The records dated June 8, 2010,

also indicate that Kramer was doing well and had no major complaints.). The ALJ concluded

that Kramer's medical treatment was effective. (Tr. 21).

    The ALJ also reviewed Kramer's medical records from 2006. See (Tr. 22), citing (Tr.

242-246). Contrary to Kramer's allegation that the ALJ ignored three years of medical history[8]

and low global assessments of functioning ("GAF")[9] scores for a single records review, see (Doc.

---

8. Notably, at the time of the ALJ hearing, Kramer's counsel stated that the alleged onset date of disability was December 20, 2009, and "we're not going back." (Tr. 28-29).

9. The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. American Psychiatric Association (2000). Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev.). Washington, DC: Author. A GAF score is set within a

8, p. 10), the ALJ considered this evidence but accorded limited weight to the GAF scores

because they "were rendered only during periods of exacerbation." (Tr. 22), citing (Tr. 181-

246).[10] This Court finds no error. See Burley v. Barnhart, 2005 U.S. Dist. LEXIS 19803, *14-15

(E.D. Pa. 2005) (concluding that the ALJ's rejection of the GAF scores because they "are

unreliable, non-scientific assessments of overall mental functioning reflecting [the claimant's]

symptoms rather than his functioning capacity" and "represented only an assessment for a

specific exacerbation" was justified). The ALJ, having determined that the medical records, the

vocational expert, and the state psychologist all established that Kramer was able to work,

---

particular range if either the symptom severity or the level of functioning falls within that range.
Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the
single value that best reflects the individual's overall functioning at the time of examination. The
rating, however, has two components: (1) symptom severity and (2) social and occupational
functioning. The GAF is within a particular range if either the symptom severity or the social
and occupational level of functioning falls within that range. When the individual's symptom
severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus,
a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score
of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious
impairment in communication or judgment or inability to function in almost all areas. Id. A
GAF score of 31-40 represents some impairment in reality testing or communication or major
impairment in several areas, such as work or school, family relations, judgment, thinking or
mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in
social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate
symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF
score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or
school functioning. Id.

10. The cited medical records indicate that in 2006, Kramer had an admission GAF score of 20
and a discharge GAF of 50. (Tr. 243) (indicating that the highest GAF rating in the previous year
was 61). The Philhaven records for the Adult Inpatient Program from December 20, 2009
through December 30, 2009, reflect an admission GAF score of 25 and a discharge GAF score of
45. (Tr. 181, 235) (noting that the highest GAF score in the past year was 45). Kramer's records
from Philhaven for the Day Hospitalization/ IOP Program from December 30, 2009 through
January 13, 2010, show an admission and a discharge GAF score of 50. (Tr. 234) (stating that
the highest GAF score in the past year was unknown).

apparently decided that the GAF scores were not accurate assessments of her ability to function. See (Tr. 22). Such a conclusion was reasonable, especially in light of the fact that Kramer worked throughout this period up until December 2009.[11] See Daniello v. Colvin, 2013 U.S. Dist. LEXIS 77305, *58 (D. Del. 2013) (concluding that "[w]hile the ALJ noted that GAF scores may suggest serious symptoms or impairment in social or occupational functioning, there was substantial evidence supporting the ALJ's finding that the record did not support such limitations"); Clapper v. Colvin, 2013 U.S. Dist. LEXIS 167551, *31-32 (W.D. Pa. 2013) (determining that the ALJ's decision to accord limited weight to the low GAF scores was reasonable because they were inconsistent with the claimant's numerous activities, ability to work part-time, and treatment history); (Tr. 31-34, 54, 60, 155-157, 166).

Kramer asserts that her recorded high GAF score of 61 is evidence that "even on a 'good day'" her level of functioning is substantially below the ALJ's estimation, and challenges the ALJ's failure to mention this score. See (Doc. 8, p. 6 n.1). However, "where a treating source has failed to provide specific limitations findings to explain a given GAF score, or to tie the GAF score into some explanation of a claimant's ability to work, the Court of Appeals for the Third Circuit has held that a court cannot be expected to provide a specific assessment of the GAF score." Detwiler v. Colvin, 2013 U.S. Dist. LEXIS 137666, *29 (W.D. Pa. 2013) (citing Gilroy v. Astrue, 351 Fed. Appx. 714, 716 (3d Cir. 2009)), adopted by 2013 U.S. Dist. LEXIS 136239 (W.D. Pa. 2013). Further, "[a]n ALJ's failure to include a GAF score in his or her discussion is considered to be harmless error where a claimant has not explained how the GAF score would

---

11. Notably, Kramer testified that she did not have anxiety at her job as a school van driver and could have returned to work after her hospitalization in December 2009, but was fired because D.B. Fisher found out about her schizophrenia. (Tr. 44).

have itself satisfied the requirements for disability in light of potentially contradictory evidence on record." Bracciodieta-Nelson v. Comm'r of Soc. Sec., 782 F. Supp. 2d 152, 165 (W.D. Pa. 2011), citing Rios v. Astrue, 2010 U.S. Dist. LEXIS 103605 (E.D. Pa. 2010). Significantly, none of the GAF scores were tied to Kramer's ability to work. See (Tr. 181, 234-235, 243). The ALJ nevertheless considered the scores and the failure to specifically mention one score is not reversible error. See Rios v. Comm'r of Soc. Sec., 444 Fed. Appx. 532, 535 (3d Cir. 2011) (finding no error in the ALJ's failure to reference two of the GAF scores).

"GAF scores do not have a 'direct correlation to the severity requirements' of the Social Security mental disorder listings." Rios, 444 Fed. Appx. at 535 (quoting 65 Fed. Reg. 50746-01, 50764-65 (2000)). "They are only medical evidence that informs the Commissioner's judgment of whether an individual is disabled." Id. (citing Watson v. Astrue, 2009 U.S. Dist. LEXIS 91628, *13 (E.D. Pa. 2009)). As stated above, the ALJ considered the evidence of record and determined that Kramer had the residual functional capacity to perform a full range of work at all exertional levels, with non-exertional limitations. (Tr. 19). In assessing this residual functional capacity, the ALJ thoroughly examined the evidence. (Tr. 19-22). To meet the requisite level of severity, Kramer must establish the A, B, and/or C criteria discussed herein. See Rios, 444 Fed. Appx. at 535 (concluding that neither the claimant's "prior GAF scores nor his other medical records indicate the marked limitations or periods of deterioration necessary for such a finding").

As to the C criteria, the ALJ concluded that the evidence of record fails to establish that Kramer has "[r]epeated episodes of decompensation, each of extended duration", or a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to

16

decompensate", or a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement", or a "complete inability to function independently outside the area of one's home." See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03(C), §12.06(C); (Tr. 18-19). Kramer claims, however, that the C criteria is satisfied because of her history of paranoia dating back to 2006 and her inability to function outside the confines of her house. See (Doc. 8, pp. 6, 8-10).

Although Kramer does not live alone, she manages her own personal hygiene, cooks, cleans, drives, and manages her finances. (Tr. 20, 37, 46, 139-143). Contrary to her appeal claim that she essentially can not go out in public without suffering an anxiety attack, see (Doc. 8, p. 8), she testified at the ALJ hearing that whether she suffers anxiety depends on where she's at and how many people are around. (Tr. 41). Furthermore, there is no medical evidence to suggest that Kramer is unable to function outside of a highly supporting living arrangement. See (Tr. 213, 225, 233-237). Rather, Dr. Poloni opined that Kramer is "self-sufficient." (Tr. 213, 225). Consequently, this Court finds substantial evidence to support the ALJ's determination that the evidence fails to establish the C criteria of Listing 12.03 or 12.06.

The ALJ accorded significant weight to the opinion of the state agency psychological consultant, Louis Poloni, Ph.D., who concluded that Kramer is able to meet the basic mental demands of competitive work on a sustained basis. (Tr. 22), citing (Tr. 211-227). The ALJ reasoned that Dr. Poloni's findings are well supported by the clinical findings and treatment history. (Id.).

Dr. Poloni completed a Psychiatric Review Technique Form on February 16, 2010. (Tr. 214-227). Dr. Poloni evaluated Kramer pursuant to Listing 12.03 and determined that she suffers

17

from schizophrenia. (Tr. 214-216). Pursuant to the B criteria, Dr. Poloni determined that

Kramer has no restrictions in activities of daily living, moderate difficulties in social functioning,

mild difficulties in maintaining concentration, persistence or pace, and one or two episodes of

decompensation. (Tr. 224). Dr. Poloni then determined that Kramer does not meet the C criteria

of Listing 12.03. (Tr. 225).

Dr. Poloni also completed a Mental Residual Functional Capacity Assessment form on

February 16, 2010. (Tr. 211-213). Dr. Poloni opined that the medical evidence establishes a

medically determinable impairment of schizophrenia. (Tr. 213). He found that Kramer

experiences social anxiety, discomfort around strangers, and has a history of panic attacks. (Id.).

Dr. Poloni reported that she has some limitation in dealing with work stresses and public contact,

but can exercise appropriate judgment in the workplace and has no restrictions in understanding,

memory, and sustaining concentration and persistence. (Id.). Dr. Poloni opined that Kramer is

"self-sufficient" and can perform necessary personal care functions. (Id.). Ultimately, Dr. Poloni

determined that she is able to meet the basic mental demands of competitive work on a sustained

basis. (Id.).

The ALJ's reliance on Dr. Poloni's opinion was appropriate. See Chandler v.

Commissioner of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011) ("Having found that the [state

agency physician's] report was properly considered by the ALJ, we readily conclude that the

ALJ's decision was supported by substantial evidence[.]"). This Court notes that no treating or

examining physician indicated that Kramer suffers from physical or mental functional limitations

that would preclude her from engaging in the range of work set by the ALJ's decision for the

18

requisite statutory twelve (12) month period.[12]  Additionally, the vocational expert, Mitchell

Schmidt, testified at the ALJ hearing that Kramer is capable of performing her past relevant work

as a janitor and material handler ("picker") because these jobs are isolative and can be performed

by anti-social individuals.  (Tr. 56-58).

       After review of the administrative record, it is determined that the decision of the

Commissioner is supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g),

the decision of the Commissioner will be affirmed.  A separate order will be issued.


**Date:** February 10, 2014

_____

**United States District Judge**


_____

12.  As previously stated, to receive disability benefits, the plaintiff must demonstrate an
"inability to engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which has lasted or
can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §
432(d)(1)(A).